IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SON NGUYEN and ROBERTO
DE OCA MARTINEZ,                        )
                                        )
              Petitioners,      )        CV 04-1815-PA
                                        )
      v.                                )
                                        )
B.I. INCORPORATED, et al.,      )        **OPINION**
                                        )
              Respondents.      )


Christine Stebbins Dahl
ASSISTANT FEDERAL DEFENDER
101 SW Main Street, Suite 1700
Portland, OR  97204

      Attorney for Petitioners

Terri J. Scadron
Leslie McKay
Margot Nadel
U.S. DEPARTMENT OF JUSTICE, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

      Attorneys for Respondents


1 - OPINION

**PANNER, J.**

Petitioners Son Nguyen and Roberto De Oca Martinez bring this petition for writ of habeas corpus under 28 U.S.C. § 2241 claiming that the Department of Homeland Security (DHS)'s Intensive Supervision Appearance Program (ISAP), violates their constitutional rights, is beyond DHS's statutory authority, and violates the Administrative Procedures Act (APA).

I held a court trial on March 13, 2006. These are my findings of fact and conclusions of law. Fed. R. Civ. P. 52. The petition is denied.

**FINDINGS OF FACT**

**I.  The ISAP Program**

   **A.  Origin**

In February 2003, the United States Department of Justice and the General Accounting Office found that the Immigration and Naturalization Service (INS)[1] was successful in deporting only 13% of non-detained aliens subject to final orders of removal (final-order aliens). Many of these aliens are not deported because their home countries refuse repatriation. These aliens can generally be held in Immigration and Customs Enforcement (ICE) custody up to 180 days, but most are released under orders of supervision that require compliance with conditions imposed by

---

[1] INS was merged into DHS and the newly created Immigrations and Customs Enforcement (ICE) bureau in March 2003.

ICE.[2]

Hoping to improve supervision and decrease the number of absconding aliens, Congress appropriated $3 million to ICE in 2003 to develop "supervised release" programs as alternatives to detention for final-order aliens considered likely to abscond or to pose a threat to public safety.

In response to this congressional directive, DHS developed the ISAP program, which is operated by respondent Behavioral Interventions, Inc. (BI), a private contractor.

ISAP has helped to improve removal rates because of the supervision ISAP case specialists are able to provide to program participants in comparison to the typical final-order alien who is subject only to an order of supervision. The average ISAP case specialist is responsible for 35-50 aliens, while the average ICE deportation officer in Portland is responsible for about 1,000.

ISAP now operates in eight cities and is used for three general categories of aliens: (1) aliens who are in removal proceedings but have not yet been issued final orders of removal and may be at risk to flee; (2) aliens who have been issued final orders of removal and are considered dangerous, but who cannot legally be held in custody any longer; and (3) aliens with final

---

[2]The conditions generally involve periodic appearances in immigration courts and before ICE deportation officers. Serious violations of these orders can result in a return to ICE detention or in criminal charges.

orders of removal who have been released from custody on general
orders of supervision, but who have violated their orders by
committing crimes or otherwise failing to comply with release
conditions.  Both petitioners here fall into the third category.

**B.  Structure**

ICE refers aliens to the ISAP program, which consists of
three phases of supervision: intense, intermediate, and regular.
The intense phase lasts for a minimum of thirty days.  During
this time, participants are electronically monitored with a
small, lightweight bracelet worn on the leg that can be concealed
by socks or long pants.  The monitoring is used to confirm that
aliens are in their residences during the 12-hour daily curfew
period.  Case specialists work with participants to create
flexible schedules so that participants may divide the 12-hour
curfew into segments to accommodate employment and family
commitments.  Participants must report to the ISAP office 3 times
per week for 5-10 minute visits with case specialists during the
intense phase.  Case specialists also make two unscheduled visits
per month to the residences of participants to verify compliance
with curfew, satisfactory living conditions, and the proper
functioning of electronic monitoring devices.  Case specialists
do not search residences.

After thirty days, participants who comply with the rules of
the intense phase as well as their orders of supervision are

4 - OPINION

moved to the intermediate phase.  During  the intermediate phase,
electronic monitoring is discontinued and participants must
report to the ISAP office only once per week.  BI employees make
only one unscheduled residence verification visit per month.

During the regular phase, the reporting requirement drops to
two times per month.  The residence verification remains at one
per month. Participants must submit a monthly schedule to their
case specialist and adhere to it throughout their time in ISAP.
During the intermediate and regular phases of the program,
curfews range between eight and ten hours per day.

There is no contractual minimum or maximum amount of time
that an alien must spend in ISAP, but ICE will generally
terminate an alien's participation in the program within one year
if there have been no serious violations of program
requirements.[3]  Once terminated, the alien will be placed under a
regular order of supervision.  Serious violations of program
requirements can lead to the alien being sent to a more intense
phase of ISAP supervision or, in the case of a participant being
charged with a crime, a return to prison or to ICE detention.

ISAP does not use physical restraint or direct surveillance.
BI does not monitor the location of participants during non-

---

[3]BI case specialists and ICE deportation officers exercise considerable
discretion over what is a serious violation and what is a minor violation.
Missing a single reporting check or staying out past curfew one night is often
overlooked if the violations do not become habitual or suggest that the
participant is headed toward serious trouble or flight.

curfew hours and does not impose restrictions, beyond those imposed by federal and state law, on the personal activities of ISAP participants.

ISAP participants can challenge an alleged program violation through a formal grievance process, discussed during ISAP orientation and explained in handbook issued to participants when they enter the program. Petitioners both testified that they are aware of the grievance process, but never complained about their monthly schedules or other program requirements.

## II.  Petitioners

Both petitioners are subject to final orders of removal. The parties agree that removal within the reasonably foreseeable future is not likely for either petitioner.

### A.  Son Nguyen

Nguyen, a citizen of Vietnam, became subject to a final order of removal in 1998. Nguyen has a lengthy criminal record, including conspiracy to commit murder and at least one major weapons charge. Nguyen was detained by INS and was then released under an order of supervision in June 2000.

In December 2003, Nguyen was convicted in an Oregon court of criminal mischief and served 13 months in state prison. Upon release from state prison, Nguyen was transferred to ICE custody. Rather than detaining Nguyen, which would have been within its legal authority because he had violated his order of supervision,

ICE released Nguyen to the ISAP program on March 17, 2005.
Nguyen has complied with program requirements and at the time of
trial was set to be terminated from ISAP and placed back on a
regular order of supervision on March 15, 2006.

### B.   Roberto De Oca Martinez

Martinez, a Cuban citizen, was convicted in September 2000
of delivery of a controlled substance (methamphetamine).  He
spent more than two years in state prison and was transferred to
INS custody in December 2002 after receiving a final order of
removal.  After 90 days in custody, ICE released Martinez under a
regular order of supervision.

In April 2005, Martinez was convicted in an Oregon court on
drugs and weapons charges.  He served three months in state
prison and was released to ICE custody on August 1, 2005.  ICE
transferred Martinez to ISAP and he has complied with ISAP rules.
Martinez is scheduled to be terminated from the program and
placed back on a regular order of supervision on August 1 of this
year.

<b>CONCLUSIONS OF LAW</b>

## I.  ICE has Statutory Authority to Operate ISAP

Petitioners contend that ISAP regulations requiring
participants to remain in their residences between eight and
twelve hours per day constitute "detention" that is outside ICE's
statutory authority  to impose reasonable "restrictions on the

7 - OPINION

alien's conduct or activities that [the Secretary of Homeland Security] prescribes for the alien."  8 U.S.C. § 1231(a)(3)(d). Petitioners contend that the government's authority to restrict aliens subject to final orders of removal is limited to imposing those conditions necessary to ensure the availability of an alien should removal become possible.

ICE may detain aliens who are subject to final orders of removal, but it generally must release these aliens after six months if "there is no significant likelihood of removal in the reasonably foreseeable future." Zadvydas v. Davis, 533 U.S. 678, 701 (2001); Tuan Thai v. Ashcroft, 366 F.3d 790, 797 (9th Cir. 2004); see also Nadarajah v. Gonzales, ___ F.3d ___, 2006 WL 686385 (9th Cir. 2006) (general immigration statutes do not allow indefinite incarceration).

Although ICE cannot keep final-order aliens in custody indefinitely, it does have the authority to release these aliens under conditions of supervision and can return aliens to detention or seek criminal penalties against aliens who violate their orders of supervision. Zadvydas, 533 U.S. at 695; Tuan Thai, 366 F.3d at 799; 8 U.S.C. § 1253(b) (providing for criminal penalties for willful failure to comply with terms of an order of supervision).

Both petitioners were released from ICE custody under orders of supervision and were placed in ISAP only after violating their

8 - OPINION

orders by being convicted of serious crimes.

I conclude that placement in ISAP is not detention. It is a form of supervision that uses no physical restraints or surveillance, both of which are typical characteristics of detention. Even if ISAP were considered detention, it is certainly less restrictive on participants than living in a federal detention center.

It is within the discretion of ICE, in its authority to reasonably restrict the conduct and activities of final-order aliens under § 1231(a)(3)(d), to reject incarceration or criminal prosecution in favor of a less stringent supervision program like ISAP.

## II.  ISAP Does Not Violate Petitioners' Constitutional Rights

### A.  Substantive Due Process

Petitioners contend that the ISAP requirements that participants adhere to curfews and wear electronic monitoring bracelets during the intense phase of the program violate their constitutionally protected liberty interests under the Fifth Amendment. Petitioners further contend that an alien's status as "non-removable" and the potential danger an alien could pose to the community are not enough to justify the possibility of "permanent detention."

The liberty interest at issue in ISAP is not fundamental as applied to final-order aliens. Demore v. Kim, 538 U.S. 510, 521

(2003), quoting Mathews v. Diaz, 426 U.S. 67, 78-80 (1976) ("In
the exercise of its broad power over naturalization and
immigration, Congress regularly makes rules that would be
unacceptable if applied to its citizens").  Because the right at
stake is not fundamental, the government's action is subject only
to rational basis review.  Id. at 528("[W]hen the government
deals with deportable aliens, the Due Process Clause does not
require it to employ the least burdensome means to accomplish its
goal.")

A government action survives rational basis review if it is
"rationally related to a legitimate [government] interest."
Lawrence v. Texas, 539 U.S. 558, 579 (2003).  Reducing the number
of absconding aliens and protecting the community from aliens
with criminal propensities are two legitimate governmental
interests furthered by the ISAP program.

ICE has an extremely difficult undertaking: administering
and supervising thousands of illegal aliens who cannot be
deported and who cannot be detained indefinitely while waiting
for removal.  As evidenced by the high rate of absconder among
this group, ICE deportation officers who regularly handle
caseloads of 1,000 or more aliens do not have the time or
resources to meet the agency's goal of accounting for and being
able to produce any alien who becomes removable.  Respondents'
evidence shows that ISAP has significantly reduced the number of

absconders among aliens placed in the program.

While "a statute permitting indefinite detention of an alien would raise a serious constitutional problem," Zadvydas, 533 U.S. at 690, Congress may "remove aliens, [subject] them to supervision with conditions when released from detention, [and] incarcerate them where appropriate for violations of those conditions." Id. at 695.

Even if one were to consider ISAP's restrictions to be a form of detention, this detention could not be considered "indefinite." ICE presumes that ISAP participants will not remain in the program for more than one year unless there is a serious violation of program requirements. At the time of trial, both petitioners were scheduled to be released from ISAP on the one-year anniversary of their assignment to the program.

**B. Procedural Due Process**

Petitioners contend that their placement in ISAP violates their procedural due process rights because they were not afforded the right to be heard on the conditions of supervision necessary in their individual situations and were not given even "the bare minima of process by which to determine" whether they violated their orders of supervision and whether the punishment is warranted. Petitioners also contend that respondents, if they found that petitioners did indeed violate their orders of supervision, should have pursued statutory remedies available

11 - OPINION

under 8 U.S.C. § 1253.[4]

Petitioners' argument that they were arbitrarily placed in ISAP with no process whatsoever is misguided.  "The fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 319, 333 (1976).  Petitioners, however, having entered ISAP following criminal convictions and incarceration, do not have the due process right to be heard on whether or not they required intense supervision under ISAP.

First, both petitioners entered ISAP after pleading guilty to serious crimes and serving time in state prison.  These convictions also violated each petitioner's order of supervision. When each petitioner pleaded guilty, he in effect also admitted to violating his order of supervision.  Thus, there was no dispute that petitioners did violate their orders of supervision.

Second, ICE's decision to place petitioners into ISAP rather than instigating criminal charges for "willful failure to comply with terms of release under supervision" under 8 U.S.C. § 1253, was a decision well within the statutory authority of ICE and one that consequently allowed petitioners to live and work in the community rather than being sent to a federal detention center.

Third, ICE deportation officer Tony Lam testified that

---

[4]The statute provides for criminal penalties including confinement of up to one year in a federal prison for willful failure to comply with the terms of an Order of Supervision.

before ICE places an alien in ISAP, an ICE officer fills out a violation report and presents it to an ICE supervisor who must approve the violation report before the alien is transferred.

Finally, petitioners can hardly claim a violation of procedural due process for lack of opportunity to be heard on the terms of their participation in
 ISAP while already in the program because neither petitioner availed himself of the ISAP grievance process.

## III.    ISAP is not Subject to the APA Notice and Comment Procedure

Petitioners contend that ISAP violates the Administrative Procedures Act (APA), 5 U.S.C. § 553, which requires that "substantive rules" be published in the Federal Register for notice and comment.  A "substantive rule" is one that "affect[s] individual rights and obligations."  Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979).

I agree with petitioners that ISAP requirements affect the rights and obligations of petitioners.  ISAP, however, was not developed as part of a new rule or series of rules subject to the notice and comment requirements of the APA.  Rather, ISAP is a minor addition to a massive supervision program administered by ICE under the statutory authority of DHS.  8 U.S.C. § 1231(a)(3). See also 8 C.F.R. § 241.5(a) (setting procedural requirements and substantive conditions for orders of supervision); 8 C.F.R. § 241.13(h)(allowing ICE to impose conditions of supervision

13 - OPINION

necessary to decrease the absconder rate and ensure the public safety).

ISAP is not a new administrative rule, and is not subject to APA requirements.

### CONCLUSION

The amended petition for writ of habeas corpus is denied.

DATED this ____ day of April, 2006.

OWEN M. PANNER
U.S. District Judge